## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

ISMAEL CASTANEDA CASTILLO,                    )
                                              )
                              **Plaintiff,**   )
                                              )         **CIVIL ACTION**
v.                                            )
                                              )         **No. 15-1113-KHV**
CAROLYN W. COLVIN,                            )
**Acting Commissioner of Social Security,**   )
                                              )
                              **Defendant.**   )
_____ )

## <u>MEMORANDUM AND ORDER</u>

Ismael Castaneda Castillo appeals the final decision of the Commissioner of Social Security to deny disability insurance benefits under Title II of the Social Security Act ("SSA"), 42 U.S.C. §§ 401 <u>et seq.</u>  For reasons set forth below, the Court finds that the final decision of the Commissioner should be reversed and remanded for further proceedings.

## I.      Procedural Background

On January 26, 2012, plaintiff filed an application with the Social Security Administration for disability insurance benefits.  <u>See</u> Application Summary For Disability Insurance Benefits, Exhibit 2D, <u>Social Security Administrative Record</u> ("<u>SSAR</u>") (Doc. #9-6) filed January 9, 2015 at 200.  He originally alleged a disability onset date of September 10, 2009 and later amended it to April 15, 2010.  The agency denied his application initially and on reconsideration.  On April 16, 2013, an administrative law judge ("ALJ") conducted a hearing.  On June 27, 2013, the ALJ concluded that plaintiff was not under a disability as defined in the SSA and that he was not entitled to benefits.  On February 13, 2015, the Appeals Council denied plaintiff's request for review. Plaintiff appeals to this Court the final decision of the Commissioner.

## II.        Standard Of Review

The Court reviews the Commissioner's decision to determine whether it is "free from legal error and supported by substantial evidence." Wall v. Astrue, 561 F.3d 1048, 1052 (10th Cir. 2009); see 42 U.S.C. § 405(g).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Wall, 561 F.3d at 1052; Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007).  It requires "more than a scintilla, but less than a preponderance." Wall, 561 F.3d at 1052; Lax, 489 F.3d at 1084.   Whether the Commissioner's decision is supported by substantial evidence is based on the record taken as a whole. Washington v. Shalala, 37 F.3d 1437, 1439 (10th Cir. 1994).  Evidence is not substantial if it is "overwhelmed by other evidence in the record or constitutes mere conclusion." Grogan v. Barnhart, 399 F.3d 1257, 1261-62 (10th Cir. 2005).  To determine if the decision is supported by substantial evidence, the Court will not reweigh the evidence or retry the case, but will examine the record as a whole, including anything that may undercut or detract from the Commissioner's findings. Flaherty v. Astrue, 515 F.3d 1067, 1070 (10th Cir. 2007).

## III.        Framework For Analyzing Claims Of Disability

Plaintiff bears the burden of proving disability under the SSA. Wall, 561 F.3d at 1062. Plaintiff is under a disability if he has a physical or mental impairment which prevents him from engaging in any substantial gainful activity, and which is expected to result in death or to last for a continuous period of at least 12 months. Thompson v. Sullivan, 987 F.2d 1482, 1486 (10th Cir. 1993) (citing 42 U.S.C. § 423(d)(1)(A)).

The Commissioner uses a five-step sequential process to evaluate disability.  20 C.F.R. § 404.1520; Wilson v. Astrue, 602 F.3d 1136, 1139 (10th Cir. 2010) (citing Williams v. Bowen,

-2-

844 F.2d 748, 750 (10th Cir. 1988)).  In the first three steps, the Commissioner determines (1) whether plaintiff has engaged in substantial gainful activity since the alleged onset, (2) whether he has a severe impairment or combination of impairments and (3) whether the severity of any impairment is equivalent to one of the listed impairments that are so severe as to preclude substantial gainful activity.  20 C.F.R. § 404.1520(c), (d); see Williams, 844 F.2d at 750-51.  If plaintiff satisfies steps one, two and three, the Commissioner will automatically find him disabled.  If plaintiff satisfies steps one and two but not three, the analysis proceeds to step four.

At step four, the ALJ must make specific factual findings regarding plaintiff's abilities in three phases.  See Winfrey v. Chater, 92 F.3d 1017, 1023-25 (10th Cir. 1996).  First, the ALJ determines plaintiff's physical and mental residual functioning capacity ("RFC").  Id. at 1023.  Second, the ALJ determines the physical and mental demands of plaintiff's past relevant work.  Id.  Third, the ALJ determines whether despite the mental and/or physical limitations found in phase one, plaintiff has the ability to meet the job demands found in phase two.  Id.; Henrie v. U.S. Dep't of Health & Human Servs., 13 F.3d 359, 361 (10th Cir. 1993).  If plaintiff satisfies step four, i.e. if plaintiff shows that he is not capable of performing past relevant work, the burden shifts to the Commissioner to establish that plaintiff is capable of performing other work in the national economy.  Williams, 844 F.2d at 750-51.

IV.   **Facts**

Plaintiff was born in 1965.  He alleges that due to back pain, he has been unable work since April 15, 2010.

A.    Medical Evidence

In 2000, Dr. Kris Lewonowski performed back surgery on plaintiff which involved a 360-

degree fusion from L4 to the sacrum.  SSAR at 490.  At that time, Dr. Lewonowski  gave plaintiff

a 75-pound lifting limit.  Id.

On April 3, 2008, plaintiff saw Mark S. Dobyns, M.D., of the Wichita Clinic, P.A., after a

large pipe on a chain struck him in the back.[1]  Id. at 526.  Plaintiff reported that he had a little

tingling into the right leg that had subsided and that initially he was fairly uncomfortable but the

pain was improving.  Id.  Dr. Dobyns found no bruising or swelling but some soreness on the back,

more on the right than the left, in the paraspinal masculature and around to the posterior axillary

line.  Id.  Dr. Dobyns prescribed Naprosyn 500 mg and ordered plaintiff to stay off work for five

days and then be reassessed because he was "fairly uncomfortable."  Id.

X-rays taken on April 3, 2008 revealed satisfactory postsurgical changes and no acute

abnormalities.  Id. at 528.

Five days later, on April 8, 2008, plaintiff returned to Dr. Dobyns.  Plaintiff reported that he

was doing a lot better and that although he still had soreness in the low back, he felt like he could

return to work on light duty.  Id. at 523.  Dr. Dobyns examined plaintiff and found that he moved

easily without evidence of significant pain.  Id.  Palpation revealed soreness in the low back but not

spasm.  Id.  Dr. Dobyns assessed that plaintiff had a lumbar contusion and sprain and was doing

reasonably well.  Id.  He recommended that plaintiff return to work with limited duties, start physical

therapy and return in ten days.[2]  Id.  Dr. Dobyns released plaintiff to work with the following

---

[1]        The record does not reflect whether plaintiff sustained the injury on April 3, 2008, or earlier.

[2]        During the course of his medical treatment, plaintiff received physical therapy numerous times.  See, e.g., SSAR at 353-368.  The Court has not included physical therapy records in this summary.

restrictions: no lifting over 20 pounds; no overhead reaching; and limited repetitive bending/lifting. Id. at 524.

X-rays taken on April 18, 2008 revealed stable postsurgical changes and no new abnormalities.  Id. at 521.

On April 29, 2008, plaintiff followed up with Dr. Dobyns.  Id. at 519.  Plaintiff reported that he was not better and in fact was "really fairly miserable."  Id.  Dr. Dobyns found pain to palpation in the right low back in the paraspinal musculature.  Id.  Dr. Dobyns assessed soft tissue injury to the low back and referred him to Amitabh Goel, M.D. for injections to help with pain.  Id.  Dr. Dobyns ordered plaintiff to refrain from working at that time.  Id. at 519-20.

On May 9, 2008, Dr. Goel examined plaintiff.  Id. at 516-17.  Plaintiff's son served as a translator.  Id. at 516.  Plaintiff rated his back pain at four out of ten on a ten-point scale, with zero being no pain and ten being the worst pain, with pain radiating down into his buttocks.  Id.  Plaintiff rated his left leg pain at three, with episodic burning, numbness and tingling.  Id.  Dr. Goel examined the lumbar spine and found tenderness at the right paraspinal region and right sciatic notch greater than left sciatic notch.  He also found some tenderness at the right lower lumbar facet joints, and lumbar spine movements volitionally restricted secondary to perceived pain but functional with five degrees of extension, 35 degrees of forward flexion and 15 degrees of sideways flexion.  Id. at 517. Dr. Goel recommended as follows:

> [Plaintiff] does appear to be fairly legitimate.  His findings are consistent with the injury in the area he describes with some low back and some radicular symptoms. We will go ahead and get a new MRI of his lumbar spine with and without contrast and then set him up for right-sided facet joint injection and subsequent caudal or lumbar transforaminal epidural steroid injections, depending on his findings. . . . Due to his significant anxiety we will do these under sedation.  He understands the rationale and wishes to proceed.  He can continue his current medication.

Id.  Dr. Goel released plaintiff to work with restrictions of no lifting more than 25 pounds and no repetitive bending or stooping.  Id. at 517-18.

On May 16, 2008, plaintiff underwent an MRI (with and without contrast) which revealed as follows:

> The pusher fusions and underbid fusions appear to be solidly healed from LR to SI. There is posterior spurring at the L5-SI underbid fusion site, causing mild central deformity of the thecal sac here.  There is mild facet anthropathy.  No occult fracture is identified.
>
> There are no areas of abnormal enhancement.

Id. at 513-14.

On May 19, 2008, Dr. Goel performed the following procedures on plaintiff:

> Right L4-5 facet joint injection with contrast.
> Right L5-SI facet joint injection with contrast.
> Utilization of fluoroscopy for needle placement.

Id. at 511.

On June 2, 2008, Dr. Goel performed the following procedures on plaintiff:

> Caudal epidural steroid injection with contrast.
> Utilization of fluoroscopy for confirmation of needle placement.

Id. at 507.

On June 10, 2008, physician assistant Vanoohe S. Baer examined plaintiff, who was accompanied by a female interpreter.  Id. at 504.  Plaintiff reported that his pain did not improve and the procedures did not help at all.  Id.  He reported that he was still having pain in his lower back on the right side and that he was taking Lortab 7.5 tablets generally three times daily, which helped

-6-

to some degree.[3]  Id.  Baer noted that according to Dr. Goel, if the injections were not helpful there was no point to do more.  Id. at 505.  Baer released plaintiff to the care of Dr. Dobyns and/or Dr. Paul S. Stein with continued light duty work restrictions.  Id.

On July 9, 2008, Dr. Stein examined plaintiff on referral from his employer's self-insured worker's compensation fund.  Id. at 490-93.  Another employee accompanied plaintiff to serve as an interpreter.  Id. at 490.  Dr. Stein reported the current status as follows:

> Pain is present in the right lower back, the buttocks, and into the right lower extremity.  He has no left lower extremity symptomatology.  The back pain is much greater than the lower extremity discomfort.  Walking and standing will increase his pain but he does not have a specific walking or standing limit.  At work he has to stand and walk most of the day and he is quite uncomfortable by the end of the workday.  Sitting and lying down provides some relief.  On a scale of 0-10, the maximum appears to be about 4 or 5 and the patient states there is always "some pain" of a low-level.
>
> Numbness and tingling is present into the right lower extremity.
>
> No bowel or bladder dysfunction.
>
> [Plaintiff] takes Lortab 7.5 daily, averaging about three tablets per day.

Id. at 490-91.

Dr. Stein performed a radiologic review as follows:

> 4/3/08 & 4/18/08.  X-rays of the lumbar spine.  There are anterior underbid fusion grafts at L4-L5 & L5-SI.  I am concerned that the graft at L4-L5 is not fully healed.  Anterior plates and screws are present.  Posterolateral pedicle screws and plates are present.  There is a posterolateral fusion bone but I cannot determine that there is a solid fusion.
>
> 5/16/08.  MRI scan of the lumbar spine.  Postoperative changes as noted above.  No evidence of essentialor foraminal stenosis.

---

[3]     Baer noted that she thought Lortab had been prescribed for use up to four times daily. Id. at 504.

-7-

Id. at 492.  The physical exam revealed as follows:

> Gate and station are intact.

> There is a well-healed midline lumbar incision.  Well-healed anterior incision.

> Lumbar range of motion is markedly restricted.  No lumbar paraspinal muscular spasm.

> Mild tenderness is present in the lumbar midline and to the right.  No guarding.

> Muscle stretch reflexes in the lower extremities are symmetrically hypoactive.  There are no long tract signs.

> Strength is intact in muscle groups of both lower extremities.  Calf circumference measures 40.5 cm on the right and 41.25 cm on the left.

> There is no dermatomal sensory deficit.

> Straight leg raising is negative.

Id. at 492-93.  Dr. Stein concluded as follows:

> [Plaintiff] had L4-SI surgery with instrumented anterior and posterior fusion in 2000 as a result of a work injury.  He apparently got along reasonably well until the current injury on 4/3/08.  Despite the radiology reports, I am concerned that the previous fusions are not fully healed.  I don't know whether the current symptoms are simply a soft tissue injury from contusion or whether the impact aggravated the previous area of surgery.

> Further information is required in regard to the fusion as well as whether or not one can determine the presence of any right-sided nerve compression.  For this reason, we will proceed with lumbar myelogram/CT scan.

> [Plaintiff] may continue with his current activity with the restriction that he not lift more than 25 pounds and not do repetitive bending or twisting of the lower back.  Repetitive lifting from below knuckle height should be avoided.

Id. at 493.

On July 26, 2008, Via Christi Regional Medical Center admitted plaintiff for leaking spinal fluid.  Id. at 468-73.  The medical records from that visit are handwritten and not legible to the

Court.  See id. at 468-73.

On August 20, 2008, Matthew N. Henry, M.D., of Abay Neuroscience Center, examined plaintiff for low back pain and right-sided numbness.  Id. at 463.  Plaintiff was taking Lortab 7.5 mg and rated his pain at four on a ten-point scale.  Id.  At worst, he rated his symptoms at seven out of ten.  Id.  Dr. Henry noted that his gait was steady, he could walk on heels and toes and his range of motion was limited with no pain.  Id.  Dr. Henry described plaintiff as "a very pleasant gentleman who was hit by a pipe in the back at work approximately four months ago, who has had some back pain, which has improved and radiates to the right buttock."  Id. at 462.  Dr. Henry noted that plaintiff had a preexisting condition consistent with previous 360 at L4-L5 and L5-SI by Dr. Lewonowski in 2000.  He recommended as follows:

> At this point in time, [plaintiff] has no discrete motor or sensory deficits.  I have reviewed the MRI of the lumbar spine and the CT myelogram of the lumbar spine and the fusion appears to be quite solid.  There is no evidence of any significant degenerative disc disease or disc damage and I have recommended he remain on a 25-pound weight restriction for four weeks and undergo work conditioning type muscle relaxants and four weeks from now I would lift all restrictions as there is no evidence of any structural damage to the spine.

Id.  Dr. Henry recommended physical therapy and released plaintiff to work with restrictions of occasional lifting/pushing/pulling of a maximum of 25 pounds.  Id. at 465-66.[4]

On February 10, 2009, plaintiff saw Dr. Dobyns for an acute exacerbation of his chronic low back pain.  Id. at 502.  Plaintiff reported that he had bent to pick something up and twisted his back, and experienced immediate pain in the lower right back.  Dr. Dobyns examined plaintiff and found as follows:

---

[4]    In the fall of 2008, plaintiff went to physical therapy at Wesley Rehabilitation Hospital for his back injury.  See SSAR at 353-68.

> [Plaintiff is] a man who is uncomfortable and does not want to sit due to discomfort. Inspection of the low back reveals that he is kinked to the right somewhat and he has pain to palpation in the right low back, just above the right PSIS. Reflexes were 1+ and symmetrical. Straight leg raise increased his pain on the right with hamstring stretch. He could heel and toe walk without weakness.

Id. at 502. Dr. Dobyns recommended that plaintiff stay home from work, continue his medications of Flexeril and Lortab and return in three days. Id.

On February 13, 2009, plaintiff returned and reported that he was still quite uncomfortable. Id. at 501. Dr. Dobyns advised him to continue bed rest and return in four days. Id.

On February 17, 2009, plaintiff returned and reported that he was doing a little better but still had a lot of discomfort. Id. at 499. Dr. Dobyns said that he had nothing to offer and suggested that plaintiff see Dr. Lewonowski.[5] Id. Dr. Dobyns released plaintiff to work with a weight restriction of 15 pounds and no overhead reaching or repetitive bending. Id.

On March 2, 2009, Ronald Manasco, M.D., of the Center for Same Day Surgery, examined plaintiff for back pain. Id. at 374. Plaintiff reported that he had back surgery in 2000 and did fine until April 3, 2008, when a pipe hit him in the back. Id. On February 10, 2009, he was picking up some trash and suddenly his lower back pain got much worse. Id. It was on the right hip area and in the lower lumbar area. Id. Plaintiff was taking Lortab and Flexeril for pain. Id. Dr. Manasco noted that an MRI showed post-surgical changes and some degenerative changes of the lumbar spine, but no disc herniation or spinal stenosis. Id. The physical exam revealed that plaintiff was tender just above his midline surgical scar in the lower back and over the right sacroiliac joint. Id. Dr. Manasco formed an impression of back pain. Id. He performed a right sacroiliac joint injection and a trigger point injection. Id. Plaintiff signed a consent form that was written in Spanish. Id. at

---

[5]   As noted, Dr. Lewonowski performed back surgery on plaintiff in 2000.

376.

On March 16, 2009, Dr. Manasco examined plaintiff again. Id. at 370. Plaintiff reported that his upper back pain was much better, but he was still having pain in the right sacrum. Id. His daughter reported that he had had a lump there ever since an injury. Id. Plaintiff was still taking Lortab and Flexeril. Id. The physical exam revealed that plaintiff was tender over the right sacroiliac joint, but even more so lateral to that in the right sacrum where the doctor noted a mobile nodule that was quite tender. Id. Dr. Manasco formed an impression of right SI joint syndrome and myofascial pain. Id. He performed a right SI injection and a trigger point injection. Id. Plaintiff signed a consent form that was written in English. Id. at 373.

From June 4 to August 4, 2009, plaintiff received treatment from Mid America Orthopedics for a work-related lower back injury.[6] Id. at 377-402. On June 4, 2009, plaintiff presented for ongoing low back pain. Id. at 382. Plaintiff reported moderate pain which was dull, achy and constant. Id. Medical providers noted the following objective findings: spinal tenderness; diffuse lumbar spine and paraspinous musculature; pain; and "[r]ange of motion lumbar flexion and extension: [lacking] end range flexion and extension." Id. at 383. They noted that clinical x-rays of the lumbar spine showed no acute fracture, diffuse degenerative changes, and hardware in an acceptable position with no slippage of the fusion site. Id. They assessed associated myofascial pain and radicular pain, right. Id. Through an interpreter, they discussed treatment options with plaintiff at length. Id. at 384. They planned to provide up to three injections and have plaintiff

---

[6]     The progress notes indicate that worker's compensation authorized Mid America Orthopedics to evaluate and manage plaintiff for non-operative treatment of lower back pain. Id. at 378-84. The progress notes are signed by Tammy Harper and Dr. Pat D. Do, M.D. Id. The record does not reveal Harper's job title, education or training.

begin physical therapy and return in one month. Id. In addition, they fitted plaintiff with an airform

back brace and prescribed Tizanidine HCL 4 mg, Tramadol HCL 50 mg and Naprosyn 500 mg. Id.

They released plaintiff to return to work with restrictions and asked him to follow up in a month.[7]

Id.

On July 6, 2009, plaintiff returned to Mid America Orthopedics. Id. 380. He reported no

improvement following the injections and said that they increased the pain for three days following

each injection. Id. at 380. Plaintiff took Tylenol, which offered "a little" reduction in pain. Id. He

had lots of spasm and tightness. Id. The airform brace provided some relief but his work area was

too hot, which made it very uncomfortable. Id. Physical therapy offered some relief during the

sessions and briefly following. Id. Medical providers made the following objective findings:

normal gait pattern; spinal tenderness; diffuse lumbar spine and paraspinous musculature; pain; and

"[r]ange of motion lumbar flexion and extension: [l]acking end range flexion and extension." Id.

at 380. They assessed associated myofascial pain and radicular pain, right. Id. at 381. Through an

interpreter, they discussed treatment options with plaintiff. Id. They planned to continue physical

therapy and medications and encouraged plaintiff to wear the airform brace when active. Id. They

released plaintiff to return to work with the same restrictions and asked him to follow up in a month.

Id.

On August 4, 2009, plaintiff returned to Mid America Orthopedics. Id. at 378. He reported

that overall he had seen little improvement in pain. Id. Although medicines did offer some relief,

---

[7]       Medical providers imposed the following work restrictions: no lifting over 25 pounds,
frequent lifting of 11 to 25 pounds and continuous carrying of zero to ten pounds; no pushing or
pulling over 50 pounds, frequent pushing or pulling of 11 to 20 pounds and continuous pushing or
pulling of zero to ten pounds; and only occasional bending of 90 degrees. SSAR at 399.

he was not interested in further injections or physical therapy, Id. Medical providers noted the following objective findings: normal gait pattern; spinal tenderness; diffuse lumbar spine and paraspinous musculature; tender region of right SI with palpable muscle spasms; pain; and "[r]ange of motion lumbar flexion and extension: [l]acking end range flexion and extension."  Id. at 378. They assessed associated myofascial pain and radicular pain, right.  Id. at 378-79.  Through an interpreter, they discussed treatment options with plaintiff.  Id. at 379.  They planned to continue medications and find maximum medical improvement with permanent work restrictions.  Id.

On August 4, 2009, Mid-America Orthopedics issued the following permanent work restrictions:  no lifting over 25 pounds, frequent lifting of 11 to 25 pounds and continuous carrying of zero to ten pounds; no pushing or pulling over 50 pounds, frequent pushing or pulling of 11 to 20 pounds and continuous pushing or pulling of zero to ten pounds; and only occasional bending of 90 degrees.  Id. at 401.

On August 14, 2009, Dr. Do responded to a request for a permanent impairment rating for plaintiff.  Dr. Do stated as follows:

> For the low back pain due to a work-related injury dated 04/08/2008, which resulted in myofascial type pain, I would place the patient in to [sic] lumbosacral category DRE II for 5% whole person impairment.  This has not taken into account his fusion as it is my opinion that this is only the myofascial pain that was resulted in this injury.

Id. at 402.

On September 10, 2009, Pedro A. Murati, M.D., of Midwest Physiatrists, P.A., performed an independent medical evaluation at the request of plaintiff's attorney.  Id. at 417-21.  Dr. Murati noted that on May 16, 2008, plaintiff underwent an MRI of his L-spine which read to show, "The pusher fusions and underbid fusion appear to be solidly healed from L4 to SI.  There is posterior

-13-

spurring at the L5-SI underbid fusion site causing mild central deformity of the thecal sac here. There is mild facet arthropathy. No occult fracture is identified." Id. Dr. Murati's physical exam revealed the following:

> MSRs[8] for the bilateral lower extremities revealed to be missing bilateral hamstring reflexes and missing a left ankle jerk reflex. Sensory examination to pinprick for the bilateral lower extremities revealed a decrease in sensation along the right L5-SI dermatome. Muscle strength testing of the bilateral lower extremities revealed 4/5 left great toe extensor.

> There was atrophy of the left calf noted. Back examination revealed L3-4 to be most tender to palpation with increased tone noted on the right upper lumbar paraspinals. SLR[9] were grossly measured to be 60 degrees on the right and negative on the left. There was a healed midline scar noted. There was a negative left SI joint examination. There was a positive right SI joint examination. There was a positive pelvic compression examination, bilaterally. There was a negative flip and distraction examination. There was a negative axial load and axial rotation examination. Pelvic brim exam revealed the right hip to be rotated forward and the left hip to be hiked.

Id. at 419-20. Dr. Murati formed an impression of low back pain with aggravation of pre-existing condition and right SI joint dysfunction. Id. at 420. He assigned a 10 per cent whole person impairment and recommended the following permanent restrictions in an eight-hour work day: occasional sit; frequent stand and walk; rare bend/crouch/stoop; occasional climb stairs, climb ladders and squat; no crawl; occasional drive; no push/pull over 20 pounds; occasional push/pull up to 20 pounds; frequent push/pull up to 10 pounds; and alternate sit, stand and walk. Id. at 420-21.

On May 29, 2012, Dr. James G. Henderson, M.D., of Central Medical Consultants evaluated plaintiff for Disability Determination Services ("DDS"). Id. at 423-26. With the help of his

---

[8]     The record does not define the term "MSRs."

[9]     The record does not define the term "SLR."

daughter as interpreter, plaintiff related his medical history.[10] Id. at 423.  Dr. Henderson noted that

plaintiff was cooperative and that his speech was in his native tongue.  Id. at 424.  He made the

following orthopedic observations:

> An assistive device is not used.
> The patient had no difficulty getting on and off the examining table.
> There was mild difficulty with heel and toe walking.
> There was mild difficulty squatting and arising from the sitting position.
> There was moderate difficulty hopping.

Id. at 425.  Dr. Henderson concluded as follows:

> The patient has a history of back discomfort.  The patient had undergone a lumbar
> laminectomy in 2000 from a work related injury.  The patient was able to return to
> work but apparently suffered a re-injury and has had pain in the back the last 4-5
> years.  Today, there is limited range of motion.  Paraspinous muscle spasm is not
> noted.  There is no asymmetrical reflex, sensory, or motor deficits noted today.
> There is mild-moderate difficulty with orthopedic maneuvers.  The patient appears
> to have had right sacroiliac injection versus trigger point injections with temporary
> improvement.

Id.

    In addition, Dr. Peter Winston, M.D., of Central Medical Consultants made the following

findings regarding plaintiff's lumbar spine:

> There has been fusion between L4 and SI with multiple plates and screws inserted
> and obliteration of the intervening disc spaces.  Vertebral height and alignment are
> satisfactory.  Disc spaces above L4 are well maintained without end plate spurring

---

[10]    Plaintiff's daughter signed a DDS form which states as follows:

> CE Provider: This form is enclosed because the person being examined has indicated
> that they [sic] do not speak English well and may bring an interpreter to the
> scheduled exam.  If the interpreter was not arranged by DDS please have them
> complete and sign this form. . . . Terminate the evaluation if the interpreter refuses
> to complete and sign this form.

Id. at 427.  By signing the form, plaintiff's daughter indicated that she can read, write, speak and
understand English and Spanish, which is the language or dialect of plaintiff.  Id.

or eburnation.  I see no abnormalities affecting the posterior elements of segments L1 through 3 or the sacroiliac joints.

Id. at 426.[11]

      B.     Plaintiff's Testimony

At the hearing on April 16, 2013, plaintiff testified through an interpreter as follows.[12]

In June of 2000, plaintiff had surgery for a previous back injury.  Id. at 48.  At that time, doctors fixed a disc and did a fusion in his back.  Id.  After that, he was able to work until he was hurt again when a pipe fell on his back.  Id.  After the second injury, doctors did not recommend surgery.  Id.

Plaintiff lives in a house with his wife, 23-year-old daughter and a three-year-old child.  Id. at 39.  He drove to the hearing from his house, which was not far.  Id.  Plaintiff completed the sixth

---

[11]      The record does not reflect whether Drs. Henderson and/or Winston imposed any work restrictions.

[12]      It appears that the interpreter did not state plaintiff's testimony verbatim.  Throughout the transcript, plaintiff's answers are given in the third person and some responses were inaudible. For example, the transcript reads as follows:

Q.     Who do you live with?
A.     His wife and one daughter.  And another, a little child.  Somebody [INAUDIBLE]. * * *
Q.     How did you get here today?
A.     He drove – it's not far. * * *
Q.     As part [of becoming a naturalized citizen], you passed an English profieciency portion of the exam?
A.     He say he studied all the questions for the test.
Q.     Say it louder.
A.     He studied the question to be a citizen for the test, so he studied all the questions he had to answer.
Q.     Did you understand the questions that you were studying and the answers?
A.     He said yes.  He studied, but [INAUDIBLE].

SSAR at 39-40.

grade and is a naturalized citizen.  Id.  Plaintiff studied and passed the English proficiency portion of the citizenship exam.  Id.

Plaintiff originally claimed a disability onset date of September 10, 2009, but he was still working at that time.  Id. at 40-41.  At the hearing, plaintiff amended his disability onset date to April 15, 2010, the date when he stopped working.  Id.

Plaintiff cannot work because he suffers pain in his back that radiates into his right leg.  Id. at 41.  He suffers the same pain every day; it does not go away.  Id. at 43.  Due to pain, he must stand and move around and cannot stand for too long.  Id.  at 41.  When sitting, he needs to move positions in the chair due to pain.  Id. at 42.  He can sit in one position for 20 minutes and then must change positions.  Id. at 43.  When standing, he tries to shift his weight between legs to cope with pain.  Id. at 42.  He can stand for ten to 20 minutes at a time.  Id. at 43.  He can walk one block but when he comes back, his leg feels heavy and in pain.  Id.  He cannot lift too much, only something small.  Id. at 44.  He can lift a gallon of milk.  Id.

Plaintiff sometimes prepares meals; his wife or daughter usually does the cooking.  Id.  He used to do things outside but no longer does.  Id.  He does not clean the house, wash dishes or do laundry.  Id.  Plaintiff pays bills, does repairs and mows the lawn with a riding lawn mower, taking periodic breaks.  Id. at 45.  He goes shopping once or twice a month.  Id.  He attends church every Sunday.  Id.  The service lasts about an hour and he moves positions during it.  Id. at 50.  After the service, he is tired and in pain and goes home.  Id. at 50-51.  At those times, his pain level is between four and five.  Id. at 51.  He feels like he needs to take a pill when the pain is between seven and ten. Id.  Two or three times a day, plaintiff lies down for 20 to 30 minutes to deal with pain.  Id.  Lying down helps his back relax a bit, but the pain does not go away.  Id.  Plaintiff's house has stairs down

-17-

to the basement.  Id.  He does not go down too much; it is difficult for him to go up and down stairs. Id.  Plaintiff sometimes visits people once a week.  Id. at 45.  He eats out two or three times a month. Id.

Two or three times a year, plaintiff goes deer hunting.  Id. at 45, 47.  He carries a gun for about 50 yards, from the place where they park to the area where they shoot.  Id. at 45.  If he shoots an animal, his son does all of the carrying and cleaning for him.  Id.  He watches television five times a day.  Id. at 46.  He reads in Spanish for about ten to 15 minutes a day and uses a computer for short periods of time two or three times a day.  Id. at 46-47.

At home, plaintiff feeds chickens and dogs.  Id. at 47.  He goes outside to feed the chickens. He takes them water and food in a small container and sometimes picks up the eggs.  Id. at 47-48. He walks the dogs in the yard.  Id. at 47.

Plaintiff went to physical therapy, which sometimes helped a little but then it hurt more.  Id. at 42.  Plaintiff had injections for pain, but they did not help.  Id.  Doctors did not prescribe a back brace or surgery.  Id.  Plaintiff did not get chiropractic treatment.  Id. at 43.

Plaintiff takes over-the-counter pills for pain.  Id. at 41-42, 49.  The pills make his stomach burn, but eating food with the medicine helps.  Id. at 42-43.  The pills help his pain for a short time. Id. at 43.  He takes pills two to four times a day, depending on the pain.  Id. at 49.  Every night, he takes a hot bath for ten to 20 minutes, which helps his back pain.  Id.  He is able to get in and out of the bathtub by himself.  Id. at 50.  Plaintiff cannot sleep through the night; he gets up once or twice in the night due to pain.  Id.

Because of a language barrier, plaintiff's brother-in-law, wife and/or daughter helped him fill out the social security forms.  Id. at 51-52.

C.      <u>Vocational Expert Testimony</u>

The ALJ asked the vocational expert about a hypothetical individual of claimant's age, education and work experience who is limited to light exertional work and can occasionally (1) climb ramps, stairs, ladders, ropes and scaffolds; (2) kneel, crouch and crawl; (3) work around unprotected heights; (4) move mechanical parts; (5) operate a motor vehicle; and (6) be exposed to extreme cold. <u>SSAR</u> at 53-54. The vocational expert testified that an individual with such limitations could not perform plaintiff's past relevant work, but could perform unskilled jobs that exist in significant numbers in the national economy, including an assembler of electrical accessories, production solderer and collater. <u>Id.</u> at 54. When asked to consider a hypothetical individual who was further limited by the need to change positions between sitting and standing every two hours to deal with back pain, the vocational expert testified that the individual could still perform the work because he would get a break every two hours and could stretch or rest his back during that time. <u>Id.</u> at 55-56. The vocational expert testified that the first two jobs could be performed either seated or standing. <u>Id.</u> at 56. The ALJ asked if the outcome would change if the individual was limited to lifting 15 pounds occasionally. The vocational expert answered in the affirmative and stated that the individual would then be limited to sedentary work and none of the jobs would be available. <u>Id.</u>

Plaintiff's attorney asked whether work would be precluded if the individual needed to change positions every 20 minutes. <u>Id.</u> at 57. The vocational expert testified that the individual could still perform the first two jobs, because they could be performed at a table or a bench. <u>Id.</u> When asked if the outcome would change if the individual needed to change positions every 15 minutes, the vocational expert answered in the affirmative stating it would be pushing limits on the

ability to concentrate and could preclude all work.  Id.  When asked whether the outcome would

change if the individual needed to lie down two or three times a day for 15 to 20 minutes at a time,

the vocational expert testified that it would depend on whether he could lie down during a schedule

break or whether he needed to do it sporadically during the day.  Id.  In the latter instance, no work

would be available.  Id.

**V.    ALJ Findings**

The ALJ made the following findings:

1.  The claimant meets the insured status requirements of the Social Security Act
through December 31, 2015.

2.   The claimant has engaged in substantial gainful activity since September 10,
2009, the alleged onset date (20 CFR 404.1571 *et seq.*). . . . At the hearing, claimant
amended his onset date to correspond to his work cessation[.] . . . There is no
subsequent indication of substantial gainful activity after April 2010. * * *

3. The claimant has the following severe impairments: obesity and degenerative disc
disease of the lumbar spine (20 CFR 404.1520(c)). * * *

4. The claimant does not have an impairment or combination of impairments that
meets or medically equals the severity of one of the listed impairments in 20 CFR
Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
* * *

5. After careful consideration of the entire record, the undersigned finds that the
claimant has the residual functional capacity to perform light work as defined in
20 CFR 404.1567(b) in that the claimant can lift 20 pounds occasionally and 10
pounds frequently; can stand and/or walk about 6 hours out of an 8 hour workday,
with normal breaks; can sit for about 6 hours out of an 8 hour workday, with normal
breaks; and push and/or pull the same weights; except the claimant can only
occasionally climb ramps, stairs, ladders, ropes, or scaffolds, kneel, crouch, crawl;
can occasionally work around unprotected heights or moving mechanical parts; can
occasionally operate a motor vehicle; and can occasionally be exposed to extreme
cold. * * *

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).
* * *

7. The claimant was born on June 10, 1965 and was 44 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563). * * *

8. The claimant has a marginal education and is able to communicate in English (20 CFR 404.1564). * * *

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)). * * *

11. The claimant has not been under a disability, as defined in the Social Security Act, from September 10, 2009, through the date of this decision (20 CFR 404.1520(g)).

Id. at 22-30 (emphasis omitted).

## VI.    Analysis

The ALJ denied benefits at step five, finding that plaintiff is capable of performing work that exists in significant numbers in the national economy. Id. at 29-30.  In so doing, the ALJ found that plaintiff suffered from medically determinable impairment(s) that could reasonably be expected to cause his alleged symptoms. Id. at 24.  The ALJ determined, however, that plaintiff's statements regarding the intensity, persistence and limiting effects of the symptoms were "not entirely credible."  Id.  Plaintiff asserts that the ALJ decision is not supported by substantial evidence because, inter alia, the ALJ did not discuss evidence regarding whether plaintiff meets medical listing 1.04A regarding disorders of the spine and therefore qualifies for benefits at step three of the analysis.  See Memorandum In Support Of Complaint For Review Of The Decision Of The Social Security Administration ("Plaintiff's Memorandum") (Doc. #11) filed August 10, 2015 at 5-13.

As noted, at step three the ALJ determines whether the severity of any impairment is equivalent to one of the listed impairments that are so severe as to preclude substantial gainful activity.  20 C.F.R. § 404.1520(c), (d); see Williams, 844 F.2d at 750-51.  If plaintiff's condition meets or equals the severity of a listed impairment, the impairment is conclusively presumed to be disabling.  See Groom v. Colvin, No. 12-1179-JWL, 2013 WL 3208591, at *5 (June 24, 2013). Where evidence shows that a plaintiff may meet a listed impairment's requirements, the ALJ is required to discuss that evidence.  See Groberg v. Astrue, 415 Fed. Appx. 65, 72 (10th Cir. 2011); Henderson v. Astrue, 383 Fed. App'x 700, 701–03 (10th Cir. 2010); Barrows v. Colvin, No. 12-2568-REB, 2013 WL 2147548, at* 3-4 (D. Colo. May 15, 2013); Jonas v. Astrue, No. 11-1140-SAC, 2012 WL 1536340, at *5 (D. Kan. May  1, 2012).

Plaintiff asserts that his impairment meets medical listing 1.04A regarding disorders of the spine.  That listing states as follows:

> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord.  With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

20 C.F.R. § Pt. 404, Subpt. P, App. 1 (2016).  For plaintiff to show that his impairment matches the listing, he must show that it meets all of the specified medical criteria.  See Sullivan v. Zebley, 493 U.S. 521, 530 (1990).  If the impairment manifests only some of the criteria, no matter how severely, it does not qualify to meet or equal the listing.  Id.  Plaintiff may show that his impairment equals a listing by showing that it is at least equal in severity and duration to the criteria of any listed

impairment.  See Groom, 2013 WL 3208591, at *5 (citing 20 C.F.R. § 404.1526(a)).

Plaintiff asserts that the medical evidence suggests that his impairment may meet Listing 1.04A.  See Plaintiff's Memorandum (Doc. #11) at 7-13.  The Court agrees.  The ALJ found that plaintiff does not meet the criteria of Listing 1.04, but the ALJ himself found that plaintiff had a severe impairment of degenerative disc disease of the lumbar spine, see SSAR at 23, which is one of the criteria of 1.04.  In addition, plaintiff cites medical evidence which he contends demonstrates nerve root compression characterized by neuroanatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness), sensory and reflex loss, and positive straight leg raising tests, sitting and supine.  See Plaintiff's Memorandum (Doc. #11) at 10-13.  The ALJ did not discuss this evidence before making his findings regarding listed impairment 1.04A.  Absent ALJ findings supported by specific weighing of the evidence, the Court cannot assess whether relevant evidence adequately supports the ALJ conclusion that plaintiff did not meet or equal any listed impairment.  See Clifton v. Chater, 79 F.3d 1007, 1009 (10th Cir. 1996).

The Commissioner asserts that substantial evidence supports the ALJ decision because the inability to ambulate is a requirement of Listing 1.04A and plaintiff points to no evidence that his ability to walk is limited.  See Brief Of The Commissioner (Doc. #12) filed September 8, 2015 at 10.  The ALJ did not make this finding in support of his conclusion and therefore the Court may not rationalize post hoc to explain the ALJ decision.  See e.g. Jonas, 2012 WL 1536340, at *5 (ALJ decision should be evaluated based solely on reasons stated in decision; reviewing court may not create post hoc rationalizations to explain treatment of evidence when that treatment is not apparent from Commissioner's decision).  Moreover, although a split of authority exists in this regard, this

Court and others have found that inability to ambulate is not a criterion of Listing 1.04A. <u>See, e.g.</u>, <u>Mazza v. Barnhart</u>, No. 06-1018-JTM, 2006 WL 4045936, at *6 (D. Kan. Oct. 25, 2006); <u>Bagdoyan v. Colvin</u>, No. CV 12-5312 RNB, 2013 WL 941965, at *1 (C.D. Cal. Mar. 11, 2013); <u>Cinatl v. Astrue</u>, 2011 WL 1743408, at *12-14 (N.D. Ill. May 6, 2011) (Listing 1.04C expressly requires functional loss; analyzing legislative intent to conclude requirement does not apply to Listing 1.04A); <u>Gorham v. Astrue</u>, No. 7:06-CV-764 LEK/DRH, 2008 WL 4030650, at *6 (N.D.N.Y. Aug. 25, 2008) (Listing 1.04A makes no mention of loss of function); <u>but see</u> <u>Miller v. Colvin</u>, No. 1:12-CV-371-GCM, 2014 WL 2208119, at *3 (W.D.N.C. May 28, 2014) (several district courts have held that Listing 1.04A includes  requirement that claimant prove that he cannot ambulate effectively); <u>Vest v. Astrue</u>, No. 5:11CV047, 2012 WL 4503180, at *4 (W.D. Va. Sept. 28, 2012) (same).

Based on the foregoing analysis, the Court finds that the ALJ finding that plaintiff does not meet listed impairment Listing 1.04A is not supported by substantial evidence. The Court therefore remands the case for the ALJ to properly analyze whether plaintiff meets or equals listed impairment 1.04A. <u>See, e.g.</u>, <u>Turner v. Colvin</u>, No. 14-1170-KHV, 2015 WL 5006154, at *4 (D. Kan. Aug. 20, 2015); <u>Mazza</u>, 2006 WL 4045936, at *6.

On remand, the ALJ shall reevaluate his determinations at the remaining steps of the sequential evaluation and reassess the disability determination. In so doing, the ALJ shall consider plaintiff's arguments that the he erroneously discounted plaintiff's credibility and posed inaccurate hypothetical questions to the vocational expert. <u>See</u> <u>Plaintiff's Memorandum</u> at 13-23. In particular, the ALJ should reevaluate whether his hypothetical to the VE should have included a language limitation. The ALJ found that although plaintiff used a translator during both the hearing and the

consultative examination, "his prior treatment notes do not indicate any difficulty speaking or communicating in English, and he was able to pass the English competency examination and become a naturalized citizen." SSAR at 29.  As noted, many of plaintiff's treatment records indicate a need for a translator.  See, e.g., id. at 504 (interpreter accompanied plaintiff to medical exam on June 10, 2008); id. at 490 (interpreter accompanied plaintiff to medical exam on July 9, 2008); id. at 370 (daughter accompanied plaintiff to medical exam on March 16, 2009); id. at 381 (doctors discussed treatment options with plaintiff through interpreter on July 6, 2009); id. at 379 (doctors discussed treatment options with plaintiff through interpreter on August 4, 2009); id. at 424 (plaintiff's speech was in native tongue at examination on May 29, 2012).  In addition, the ALJ cited no authority for his conclusion that passing the English exam to become a naturalized citizen demonstrates that plaintiff can speak and communicate in English.  See Gandarilla v. Astrue, No. 08-cv-00375-MSK, 2009 WL 524980, at *8 (D. Colo. March 2, 2009) (assumption that plaintiff would have been required to speak and understand English to become naturalized citizen cannot serve as substantial evidence of abilities to communicate in English); see also Lopez v. Colvin, No. 14-cv-00571-BH, 2015 WL 1473677, at *10 (N.D. Tex. 2015) (when claimant is illiterate or unable to communicate in English, ALJ hypothetical should define claimant's educational level or English language proficiency).

   **IT IS THEREFORE ORDERED** that judgment shall be entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) **REVERSING** the Commissioner's decision and **REMANDING** for further proceedings in accordance with this memorandum and order.

Dated this 7th day of October, 2016 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge
